## Supreme Court.

## NEW-YORK, MAY TERM, 1804.

The People,
v.  } LIBEL.
Harry Croswell,

KENT, J. The defendant was convicted, at the last circuit court in *Columbia* county, of printing and publishing a scandalous, malicious and seditious libel upon *Thomas Jefferson*, the President of the United States. And a motion was made at the last term, for a new trial, on the ground of a misdirection of the judge. The motion was principally founded upon the two following objections :

1. That the Chief Justice charged the jury, that it was not their province to inquire or decide on the intent of the defendant, or whether the publication was libellous or not. That those were questions of law, to be decided exclusively by the court, upon the return of the *postea ;* and that the only points for their consideration were, first, whether the defendant published the paper stated in the indictment ; and secondly, whether the *inuendoes* were true ; and that if they were satisfied of these two points, it was their duty to find the defendant guilty.

2. That he denied to the defendant the opportunity of producing testimony to prove the truth of the libel, on the ground that the defendant could not be permitted to give in evidence to the jury, the truth of the charges contained in the libel.

I shall consider these two very important questions in the order in which they have been stated.

1. The criminality of the charge in the indictment consisted in a malicious and seditious *intention.* (Hawk. tit. Libel, s. 1. 2 Wils. 403. 1 Esp. Cas. 228.) There can be no crime without an evil mind. *Actus non facit reum, nisi mens sit rea.* The simple act of publication, which was all that was left to the jury, in the present case, was not, in itself, criminal. It is the application to times, persons and circumstances ; it is the *particular* intent and tendency that constitute the libel. Opinions and acts may be innocent under one set of circumstances, and criminal under another. This application to circumstances, and this particular intent, are as much *matters of fact*, as the printing and publishing. (*Winne's Eunomus*, dial. 3. s. 53.) Where an act, innocent in itself, becomes criminal, when done with a particular intent, that intent is the material *fact* to constitute the crime. (Lord Mansfield, 3 Term Rep. 429. in the note.) And I think there cannot be a doubt, that the mere publication of a paper is not, *per se*, criminal ; for otherwise, the copying of the indictment by the clerk, or writing a friendly and admonitory letter to a father, on the vices of his son, would be criminal. The intention of the publisher, and every circumstance attending the act must, therefore, be cognizable by the jury, as questions of fact. And if they are satisfied that the publication is innocent ; that it has no mischievous or evil tendency ; that the mind of the writer was not in fault ; that the publication was inadvertent, or from any other cause, was no libel, how can they conscientiously pronounce the defendant guilty, from the mere fact of publication ? A verdict of *guilty*, embraces the whole charge upon the record ; and are the jury not permitted to take into consideration the only thing that constitutes

NEW-YORK, the crime, which is the malicious intent? According
1804.       to the doctrine laid down at the trial, all that results
The People  from a verdict of guilty is, that the defendant has pub-
v.          lished a certain paper, and that it applies to certain per-
Croswell.   sons, according to the *inuendoes*; but whether the pa-
            per be lawful or unlawful; whether it be criminal, or
innocent, or meritorious; whether the intent was wick-
ed or virtuous, are matters of law which do not belong
to the jury, but are reserved for the determination of
the court. The prosecutor selects and sets forth such
parts only of the paper as he deems exceptionable; but
the defendant is allowed (2 Salk. 517.  3 Term. Rep.
429.) to read in evidence the context, in order to de-
termine the intent, and yet how can this evidence be
material or pertinent, if the jury are not to judge of that
intent? Or how can it be material to the court above,
on the motion in arrest of judgment, when that motion
is founded entirely on the charge as it appears upon
the face of the record? To bear out the doctrine, the
courts have involved themselves in inconsistency and
paradox; and I am induced to believe that it is a depar-
ture from the ancient, simple, and true theory of trial
by jury in criminal cases. To deny to the jury the
right of judging of the intent and tendency of the act,,
is to take away the substance, and with it the value and
security of this mode of trial. It is to transfer the ex-
clusive cognizance of crimes from the jury to the court,
and to give the judges the absolute control of the press.
There is nothing peculiar in the law of libels, to with-
draw it from the jurisdiction of the jury. The twelve
judges, in their opinion to the house of lords, (April,
1792,) admitted that the general criminal law of Eng-
land was the law of libel. And by the general criminal

law of England, the office of the jury is judicial. "They only are the judges," as Lord Somers observes, (Essay on the Power and Duty of Grand Jurors, p. 7.) "from whose sentence the indicted are to expect life or death. Upon their integrity and understanding, the lives of all that are brought into judgment do ultimately depend. From their verdict there lies no appeal. They resolve both law and fact, and this has always been their custom and practice."

If the criminal intent be, in this case, an inference of law, the right of the jury is still the same. In every criminal case, upon the plea of not guilty, the jury may, and indeed they *must*, unless they choose to find a spe cial verdict, take upon themselves the decision of the law, as well as the fact, and bring in a verdict as comprehensive as the issue ; because, in every such case, they are charged with the deliverance of the defendant from the crime of which he is accused. The indictment not only sets forth the particular fact committed, but it specifies the nature of the crime. Treasons are laid to be done traitorously, felonies feloniously, and public libels to be published seditiously. The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it *traitorously ;* and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with *malice prepense,* or took the property *feloniously.* So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it *seditiously.* In all these cases, from the nature of the issue, the jury are to try not only the *fact,* but the *crime,*

NEW-YORK, 1804.

The People v. Croswell.

and in doing so, they must judge of the *intent*, in order to determine whether the charge be true, as set forth in the indictment. (Dagge on Criminal Law, b. 1. c. 11. s. 2.) The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

This right in the jury to determine the law as well as the fact, has received the sanction of some of the highest authorities in the law.

The inquest, says Littleton, (s. 368.) may give a verdict as general as the charge, if they will take upon themselves the knowledge of the law. The same principle is admitted by Coke, and other ancient judges; (Co. Litt. 228. a. 4 Co. 53. b. Wrey, Ch. J. Hob. 227.) although they allege it to be dangerous for the jury to do so, because if they mistake the law, they run the hazard of an *attaint*. As the jury, according to Sir Matthew Hale, assist the judge in determining the matter of fact, so the judge assists the jury in determining points of law. And it is the *conscience of the jury*, he observes, that must pronounce the prisoner guilty or not guilty. It is they, and not the judge, that take upon them his guilt or innocence. (Hist. Com. Law, c. 12. H. H. P. C. vol. 2. 313.) Blackstone, in his Commentaries, (vol. 4. p. 354.) when speaking of the verdict of the jury in criminal cases, says, that the jury may find a special verdict, where they doubt the matter of law, and, therefore, choose to leave it to the determination of the court; though they have an unquestionable *right* to determine upon all the circumstances, and find a general verdict, if they will hazard a breach of their oaths. The statute of Westm. 2. (13 Edw. I.) which

declared that the justices of *assize* should not *compel the jurors* to say precisely whether it be a disseisin or not, so as they *state the truth of the fact and pray the aid of the justices*, was in affirmance of the common law ; (9 Co. 13. a. Plowd. 92.) and was intended for the relief of the jurors, and that they should not be compelled to find, at their peril, things doubtful to them in law. This indulgence to the jury, and which extended to all cases civil and criminal, is the most decisive proof that on a general verdict, the jury were obliged to judge of the whole matter in issue, and that the direction of the court upon the point of law was not conclusive upon their judgments, or binding on their consciences. The twelve judges, in their opinion, to which I have alluded, " disclaim the folly of endeavoring to prove that a jury who can find a general verdict, cannot take upon themselves to deal with matter of law arising on a general issue, and to hazard a verdict made up of the fact and of the matter of law, according to their conception of the law, against all direction by the judge."

To meet and resist directly this stream of authority, is impossible. But while the *power* of the jury is admitted, it is denied that they can *rightfully* or *lawfully* exercise it, without compromitting their consciences, and that they are bound implicitly, in all cases, to receive the law from the court. The law must, however, have intended, in granting this power to a jury, to grant them a lawful and rightful power, or it would have provided a remedy against the undue exercise of it. The true criterion of a legal power, is its capacity to produce a definitive effect liable neither to censure nor review. And the verdict of not guilty, in a criminal case,

NEW-YORK,
1804.

The People
v.
Croswell.

is, in every respect, absolutely final. The jury are not liable to punishment, nor the verdict to control. No attaint lies, nor can a new trial be awarded. The exercise of this power in the jury has been sanctioned, and upheld in constant activity, from the earliest ages. It was made a question by Bracton, (fol. 119. a. b.) who was to sit in judgment upon, and decide points of law, on appeals in capital cases. It could not be the king, he says, for then he would be both prosecutor and judge ; nor his justices, for they represented him. He thinks, therefore, the *curia and pares* were to be judges in all cases of life and limb, or disherison of heir, where the crown was the prosecutor. And, indeed, it is probable that in the earlier stages of English juridical history, the jury, instead of deciding causes under the direction of the judge, decided all causes without the assistance of the judge. (Barrington on the Statutes, 18. 26. 311.)

The maxim that *ad quæstionem legis respondent judices, ad quæstionem facti respondent juratores,* is the ground of the doctrine, that the jury are not in any case to judge of the law ; and where the law and fact can be separated, as in the case of demurrer and special verdict, the maxim is literally true. (Vaughan, 149.) But a libel is a compound of law and fact. To separate them is difficult and dangerous, and, without a special verdict, the jury are authorized and bound to judge from a combined consideration of both. If the axiom be construed so strictly as to exclude the jury, in every case, from any concern with questions of law that arise on the trial, it would equally exclude the court from any capacity or right to consider the fact, and no new trial

could be awarded on the ground that the jury had mis-
taken the fact. But the maxim is to be received, on
the one side as well as on the other, with some qualifi-
cation, to be defined by the necessity of the case and
the practice of the courts.

The first case I have met with, in which the question
arose between the jurisdiction of the court and jury,
was upon the trial of Lilburne for high treason, in 1549.
(2 St. Tr. 69. 81, 82.) He insisted, in coarse but in-
telligible language, that the jury were judges of law
and fact, but the court, in language equally rude,
denied it. He insisted upon the privilege of read-
ing law to the jury, but the court refused it. The
jury, however, acquitted him, and they declared that
they took themselves to be judges of the law as
well as of the fact, notwithstanding the court had said
otherwise. Bushell's case followed soon after, and it
is, in every view, important. (Vaughan, 135. Sir T.
Jones, 13.) He was one of the jurors, on the trial of
an indictment for a misdemeanor, before the court of
*oyer and terminer* in London, and was fined and com-
mitted, because he and the other jurors acquitted the
defendant against full proof, *and against the direction of
the court, in matter of law.* He was brought into the
court of C. B. upon *habeas corpus*, and discharged ; and
Lord Ch. J. *Vaughan* delivered, upon that occasion, in
behalf of the court, a learned and profound argument.
in favour of the rights of the jury. He admitted that
where the law and fact were distinct, the provinces of
the court and jury were exclusive of each other, so that
if it be demanded what is a fact, the judge cannot an-
swer it ; and if what is the law, the jury cannot answer
it. But that upon all general issues, where the jury

NEW-YORK, 1804.

The People v. Croswell.

find a general verdict, they resolve both law and fact completely, and not the fact by itself.

Upon the trial of Algernon Sidney, (3 St. Tr. 817.) the question did not distinctly arise ; but Lord Ch. J. *Jeffries*, in his charge to the jury, told them it was the duty of the court to declare the law to the jury, and *the jury were bound to receive their declaration of the law.* They did, in that case, unfortunately, receive the law from the court, and convicted the prisoner, but his *attainder* was afterwards reversed by parliament ; and the law, as laid down on that trial, was denied and reprobated ; and the violence of the judge, and the severity of the jury, held up to the reproach and detestation of posterity. The case of the *Seven Bishops* (4 St. Tr.) is a precedent of a more consoling kind ; it was an auspicious and memorable instance of the exercise of the right of the jury to determine both the law and the fact. I shall have occasion to notice this case hereafter, and shall only observe, for the present, that the counsel on the trial went at large into the consideration of the law, the intent and the fact ; and although the judges differed in opinion, as to what constituted a libel, they all gave their opinions in the style of advice, not of direction, and expressly referred the law and the fact to the jury. Mr. J. Holloway, in particular, observed, that whether libel or not, depended upon the *ill intent*, and concluded by telling the jury, *it was left to them to determine.*

In the case of Tuchin, (5 St. Tr. 542.) who was tried for a libel before Ch. J. *Holt*, in 1704, the judge, in his charge to the jury, expressly submitted to them the whole question on the libel. After reasoning on the libellous nature of the publication, he observes that *now they are to consider whether the words he had read to*

*them did not tend to beget an ill opinion of the adminis‹ tration of the government.*

The weight of the decisions thus far, was clearly in favour of the right of the jury to decide generally upon the law and the fact. But, since the time of Lord Holt, the question before us has been an unsettled and litigious one in Westminster Hall. Lord Mansfield was of opinion (3 Term. Rep. 429.) that the formal direction of every judge, since the revolution, had been agreeable to that given in the case of *The Dean of St. Asaph ;* but the earliest case he mentions is that of Franklin, before Lord Raymond, in 1731 ; (9 St. Tr. 255.) and that has been considered as the formal introduction of the doctrine now under review. The charge of Sir John Holt, in Tuchin's case, appears to me to be decidedly to the contrary ; and in another case before Holt, (11 Mod. 86. Queen v. Brown,) the attorney-general admitted that the jury were the judges *quo animo* the libel was made. The new doctrine, as laid down in the present case, may, therefore, be referred to the case of Franklin. But in Oneby's case, (2 Ld. Raym. 1485. 2 Str. 766.) who was tried a few years before, for murder, Lord Raymond and the court of K. B. advanced a general doctrine, which may perhaps be supposed to curtail the powers of the jury as much as the decision in the case before us. He said, that all the judges agreed in the proposition, that the court were the judges of the malice, and not the jury; that upon the trial the judge directs the jury, as to the law arising upon the facts, and the jury may, if they think proper, give a general verdict ; or if they find a special verdict, the court is to form their judgment from the facts found, whether there was malice or not ; because, in

NEW-YORK, special verdicts, the jury never find, in express terms,
1804. the malice, but it is left to be drawn by the court.

The People    The case to which this opinion applied, was that of a
v. special verdict; and taking it together, I see nothing in
Croswell. it inconsistent with my view of the subject.  But, Sir
Michael Foster, in his Discourse on Homicide, (p. 255,
256, 257.) and probably with this decision in view,
lays it down as a rule, that the *malus animus*, which is
to be collected from all the circumstances, is a question
for the court, and not for the jury ; and that where the
law is clear, the jury, under the direction of the court,
in point of law, may, and, if they are well advised, al-
ways will, find a general verdict, conformably to such
disection, for, he adds, *ad quæstionem juris non respon-
dent juratores.*  This opinion, laid down in this unqua-
lified manner, while it admits the *power*, goes far to hold
that the jury are *of right* bound in all cases, to receive
as conclusive, the direction of the court.  He refers,
however, to no decisions to warrant this opinion, and it
must be received on his single, although, undoubtedly,
very respectable authority.  If he alluded to the case
of Oneby, or to any of the important cases in *homicide*,
which are there cited, they do not warrant the doctrine,
for those were cases of special verdicts where the ma-
lice is referred to the judgment of the court.  To say
that the jury cannot rightfully judge of the *malus ani-
mus* of the prisoner, in which his crime consists, is, in
my opinion, a monstrous proposition, destructive of the
essence and excellence of trial by jury, and inconsistent
with the genius of the English judiciary, as drawn from
its history and constitutional policy.

To return to the case of Franklin ; the counsel for
the defendant, who were very able lawyers, contended
that the jury had a right to judge of the intent and ten-

dency of the publication; but Lord Raymond, in his direction to the jury, went the whole length of the charge in the present case. He told the jury that there were two things only for their consideration: 1st. Whether the defendant was guilty of publishing; and, 2d. Whether the *iuuendoes* were justly stated and applied; and that the third question, whether the publication was libellous, belonged exclusively to the court as matter of law. The same doctrine was laid down by Ch. J. *Lee*, in the case of Owen; (10 St. Tr. Appendix, 196.) by Sir *Dudley Ryder*, in the case of Nutt; and by Lord *Mansfield*, in the cases of Shebbeare, Woodfall, and others, (5 Burr. 2661. 3 Term. Rep. 430.) It is to be observed, however, that in none of these cases did the counsel for the defendants renounce what they conceived to be the privilege of the defendants, and the right of the jury. Lord *Camden* was counsel for the defendants, in the cases of Owen and Shebbeare, and he claimed and exercised the right of addressing the jury on the whole matter of the libel. (Parliamentary Senator, vol. 5. p. 822.) In the case of Woodfall, the defendant's counsel likewise pressed the jury to acquit him, on the ground that the intent was innocent, and the paper not libellous; and the counsel for the crown, on the other hand, urged to the jury the criminal intent and pernicious tendency of the paper. The same steps were followed by counsel, in the case of the Dean of St. Asaph. (3 Term. Rep. 428.) This uniform practice of counse of the first rank at the bar is pretty strong evidence that the rule laid down in Franklin's case was never aquies ced in, nor regarded as the settled law. But it was not the counsel only who dissented from this doctrine. Lord *Camden* and Lord *Loughborough* did, as judges, uniformly resist it, and one of them declared, that it had

NEW-YORK,
1804.

The People
v.
Croswell.

always been his practice, in cases of libel, to state the law as it bore on the facts, and to refer the combined consideration to the jury. (Senator, vol. 3. p. 647. 650, 651. Vol 5. p. 686. 822.) So Lord *Mansfield* departed from Lord *Raymond's* rule, upon the trial of John Horne. (11 St. Tr. 283.) He told the jury there were two points for them to satisfy themselves in, in order to form their verdict. 1st. Did the defendant compose and publish ? 2d. Was the sense of the paper libellous, as charged ? He concluded by telling them, that they would judge of the meaning of it ; that it was a matter for their judgment. His lordship admits to us, in another place, (3 Term. Rep. 418.) that the counsel for the crown and the judges have sometimes expatiated to the jury on the enormity of the libel, with the view to remove prejudices, and obviate captivating harangues ; and this confession shows the difficulty and danger of attempting to separate the law and the fact, the publication and the intent, when the issue, the arguments of counsel, and the verdict, comprehended both.

The constant struggle of counsel, and of the jury, against the rule so emphatically laid down by Lord *Raymond*, the disagreement among the judges, and the dangerous tendency of the doctrine, as it affected two very conspicuous and proud monuments of English liberty, trial by jury and the freedom of the press, at length attracted and roused the attention of the nation. The question was brought before the parliament, and debated in two successive sessions. (In 1791 and 1792, see Debates in the Senator, vols. 3, 4, 5.) There was combined, in the discussion of this dry law question, an assemblage of talents, of constitutional knowledge, of practical wisdom, and of prefessional erudition, rarely, if ever

before surpassed. It underwent a patient investigation and severe scrutiny, upon principle and precedent, and a bill declaratory of the right of the jury to give a general verdict upon the whole matter put in issue, without being required or directed to find the defendant guilty merely on the proof of publication and the truth of the inuendoes, was at length agreed to, and passed with uncommon unanimity. It is entitled " An act to remove doubts respecting the functions of juries in cases of libel ;" and, although I admit that a declaratory statue is not to be received as conclusive evidence of the common law, yet it must be considered as a very respectable authority in the case ; and especially, as the circumstances attending the passage of this bill, reflect the highest honour on the moderation, the good sense, and the free and independent spirit of the British parliament.

It was, no doubt, under similar impressions of the subject, that the act of congress, for punishing certain libels against the United States, (Laws U. S. vol. 4. p. 204.) enacted and declared, that the jury who should try the cause, should have a right to determine the law and fact, under the direction of the court, as in other cases ; and before the passing of that statute, the same doctrine was laid down in full latitude, and in explicit terms, by the Supreme Court of the United States. (3 Dallas, 4.)

The result from this view is, to my mind, a firm conviction that this court is not bound by the decisions of Lord *Raymond*, and his successors. By withdrawing from the jury the consideration of the essence of the charge, they render their function nugatory and contemptible. Those opinions are repugnant to the more ancient authorities which had given to the jury the power,

and with it the right, to judge of the law and fact, when they were blended by the issue, and which rendered their decisions, in criminal cases, final and conclusive. The English bar steadily resisted those decisions, as usurpations on the rights of the jury. Some of the judges treated the doctrine as erroneous, and the parliament, at last, declared it an innovation, by restoring the trial by jury, in cases of libel, to that ancient vigour and independence, by which it had grown so precious to the nation, as the guardian of liberty and life, against the power of the court, the vindictive persecution of the prosecutor, and the oppression of the government.

I am aware of the objection to the fitness and competency of a jury to decide upon questions of law, and, especially, with a power to overrule the directions of the judge. In the first place, however, it is not likely often to happen, that the jury will resist the opinion of the court on the matter of law. That opinion will generally receive its due weight and effect ; and in civil cases it can, and always ought to be ultimately enforced by the power of setting aside the verdict. But in human institutions, the question is not, whether every evil contingency can be avoided, but what arrangement will be productive of the least inconvenience. And it appears to be most consistent with the permanent security of the subject, that in criminal cases the jury should, after receiving the advice and assistance of the judge, as to the law, take into their consideration all the circumstances of the case, and the intention with which the act was done, and to determine upon the whole, whether the act done, be, or be not, within the meaning of the law. This distribution of power, by which the court and jury mutually assist, and mutually check each other, seems to be the safest, and,

consequently, the wisest arrangement, in respect to the trial of crimes. The constructions of judges, on the intention of the party, may often be (with the most upright motives) too speculative and refined, and not altogether just in their application to every case. Their rules may have too technical a cast, and become, in their operation, severe and oppressive. To judge accurately of motives and intentions, does not require a master's skill in the science of law. It depends more on a knowledge of the passions, and of the springs of human action, and may be the lot of ordinary experience and sagacity.

My conclusion on this first point then, is, that upon every indictment, or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the inuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of " the whole matter put in issue upon such indictment or information." (Stat. 32 Geo. III.) That in this, as in other criminal cases, it is the duty of the court, " according to their discretion, to give their opinion and direction to the jury on the matter in issue ;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

2. The second point in the case, although a question of evidence merely, is equally important, and still more difficult. It was made a very prominent point upon the argument, and the decision of it is essential for the direction of the judge who is to preside at the new trial that may be awarded.

NEW-YORK,
1804.

The People
v.
Croswell.

As a libel is a defamatory publication, made with a malicious intent, the truth or falsehood of the charge may, in many cases, be a very material and pertinent consideration with the jury, in order to ascertain that intent. There can be no doubt that it is competent for the defendant to rebut the presumption of malice, drawn from the fact of publication; and it is consonant to the general theory of evidence, and the dictates of justice, that the defendant should be allowed to avail himself of every fact and circumstance that may serve to repel that presumption. And what can be a more important circumstance than the truth of the charge, to determine the goodness of the motive in making it, if it be a charge against the competency or purity of a character in public trust, or of a candidate for public favour, or a charge of actions in which the community have an interest, and are deeply concerned? To shut out wholly the inquiry into the truth of the accusation, is to abridge essentially the means of defence. It is to weaken the arm of the defendant, and to convict him, by means of a presumption, which he might easily destroy by proof that the charge was true, and that, considering the nature of the accusation, the circumstances and time under which it was made, and the situation of the person implicated, his motive could have been no other than a pure and disinterested regard for the public welfare. At the same time, this doctrine will not go to tolerate libels upon private character, or the circulation of charges for seditious and wicked ends, or to justify exposing to the public eye one's personal defects or misfortunes. The public have no concern with, nor are they injured by such information, and the truth of the charge would rather aggravate than lessen the baseness and evil tendency of

the publication. It will, therefore, still remain, in every case, a question for the jury, what was the intent and tendency of the paper, and how far the truth, in the given case, has been used for commendable, or abused for malicious purposes.

This principle in the law of libels is considered as rational and sound, in an ethical point of view ; (Paley's Moral Philosophy, p. 188.) and to this extent, the writers on the civil law have allowed the truth to excuse a defamatory accusation. The opinion of Vinnius, in his Commentaries on the Institutes, (lib. 4. tit. 4. s. 1.) is so pertinent and forcible, and he states the just distinction with such perspicuity, that what he says merits our particular attention. " *Tria ferè hic quæri solent ? Primum est, an veritas convitii excuset injuriantem. Interpretes vulgo respondent, excusare, si id, quod abjicitur, tale est, ut publicè intersit illud sciri ; veluti si quis latro, homicida, adulter, sacrilegus appelletur : eoque pertinere responsum juriscousulti in L. cum qui 18. in pr. hoc tit. ubi ait, eum, qui nocentem infamavit, non esse bonum et æquum condemnari. Peccata enim nocentium nota esse et oportere et expedire. Hoc autem vel maximè procedet, si infamaverit apud magistratum : quoniam tum omnino præsumitur fecisse, ut super objecto crimine, quod tamen utique probare debet, inquisitio institueretur. Alias si ex circumstantiis animus injuriandi adfuisse arguatur, veluti si in rixa id fecerit odio impulsus, petulantiam istam impunitam relinqui non debere, l. 3. c. de off. rect. prov. Sin autem quod objicitur innotescere nihil interest, puta si alter pœnam delicti sui sustinuerit, aut si vitium naturale objiciatur, claudus aliquis, luscus aut gibbosus vocetur, veritatem convitii non excusare, quominus animo injuriandi id factum præsumatur : contrarii tamen probationem hic admittendam.*"

That falsehood is a material ingredient in a public libel, is a doctrine not without precedent in former times ; it has always been asserted, and occasionally admitted, by the English courts. In this country it has taken firmer root, and in regard to the measures of government, and the character and qualifications of candidates for public trust, it is considered as the vital support of the liberty of the press.

The English decisions on the subject of libels have not been consistent in principle. The reason assigned for the punishment of libels, whether true or false, is because they tend to a breach of the peace, by inciting the libelled party to revenge, or the people to sedition. It is not the matter, but the manner, say the books, which is punishable. (1 Hawk. tit. Libel, s. 3. 6, 7. Hudson on the Star Chamber, p. 102.) This reason, however, according to some late decisions, is made to yield to stronger reasons of a public nature, although the instances given come equally within the rule, as they equally tend to defame and provoke. It is no libel to publish a true account of proceedings in parliament or courts of justice, notwithstanding the paper may be very injurious to the character of individuals or of magistrates; because those proceedings are open to all the world, and it is of vast importance to the public, that they should be generally known. (8 Term. Rep. 297, 298. 1 Bos. & Pull. 526.) It was held no libel to treat with asperity the character of the officers of Greenwich hospital, where the publication was distributed only among the governors of the hospital, because they are the persons who, from their situation, are called upon to redress the grievance, and have the power to do it. (Rex v. Baillie, Mich. 20 Geo. III. by Lord *Mansfield.* Esp. Dig. 506.) It might be

easily perceived, that according to the same doctrine, it ought not to be a libel to publish generally a true account of the character and conduct of public rulers, because it is of vast importance that their character and actions should be accurately understood, and especially by the public, to whom alone they are responsible. This rule of decision, in the different cases varies, but the principle applies equally to each.

The doctrine that the truth of the matter charged was no defence to a public prosecution for a libel, came from the court of Star Chamber. William Hudson, who was an eminent practiser in that court, in the reign of James I. compiled, early under his successor, a very copious and learned treatise on its jurisdiction and practice: (See 2 Collectanea Juridica.) He says, that libels had in all ages been severely punished here, but especially when they began to grow frequent, about the reign of Elizabeth. This fact would lead to interesting reflection. The era here referred to was the very time when the use of printing had grown familiar, when learning was disseminated, when civil and political rights became objects of inquiry, and, to use the words of Mr. Hume, when "symptoms had appeared of a more free and independent genius in the nation." Hudson cites upwards of twenty adjudged cases, in the Star Chamber, upon libels, and says that there were two gross errors which had crept into the world concerning libels : one of which was, that it was not a libel, if true ; but this, he adds, had been long since expelled out of that court; and he mentions the case of Breverton, Mich. 2. Jac. I. in which that species of defence was attempted to a charge of bribery and extortion in a public trust, and was over-ruled. This treatise of Hudson establishes two very

NEW-YORK,
1804.

The People
v.
Croswell.

important facts; the one that the court of Star Chamber established the doctrine in question, and the other, that it was still the public sentiment, which he calls " a gross error in the world," that the truth might be a defence to a libel; and this defence was attempted in that court as late as in the reign of James. Mr. Barrington (Observations on the Statutes, 68.) has given us a part of a curious letter, written at that time by the Dean of St. Paul's, from which we may infer his alarm and disgust at the new libel doctrines of the Star Chamber. " There be many cases," he observes, " where a man may do his country good service, by libelling; for where a man is either too great, or his vices too general to be brought under a judiciary accusation, there is no way but this extraordinary method of accusation. Sealed letters in the Star Chamber have now-a-days been judged libels." Lord *Coke* has reported some of those Star Chamber decisions, on this very subject, and in one of which we find the same point resolved, that had been ruled the year before, in the case of Breverton. (Pasch. 3. Jac. I. 5 Co. 125.) He was, in his time, says Hudson, as well exercised in the case of libels as all the attorneys that ever were before him; and yet it appears he was not so well disciplined in the new doctrine, but that in the case of Lake v. Hutton, (Hob. 252.) which afterwards arose in the Star Chamber, he insisted, that if the libel was true, the defendant might justify it. These cases and facts are sufficient to show that the doctrine in question was not considered then as the settled law; that it was regarded as an innovation, for it gave dissatisfaction, and met with opposition.

The proceedings in the Star Chamber were according to the course of those courts which follow the civil law.

They proceeded by bill, without a jury, and compelled <span>NEW-YORK,</span> the party accused to answer upon oath. The decisions of that court upon libels were probably borrowed, in a great degree, from Justinian's Code. The very defini- tion of a libel, and the title of one of Coke's cases, was taken from thence ; and Hilliwood's case, in the 43 and 44 Eliz. (5 Co. 125, 126. a.) was grounded entirely upon the severe edict of Valentinian and Valens. (Code lib. 9. tit. 36.) And yet there is good reason to believe, that in the best ages of the Roman law, it spoke a milder and more rational language ; for Paulus, in the Digest, (Lib. 47. tit. 10. c. 18.( holds it to be against good conscience, to condemn a man for publishing the truth ; and the Ci- vilians are generally of opinion, that the truth will ex- cuse defamation, if the charge relate to matter proper for public information. (Vinnius, ubi sup. Perezii. Prœlec. vol. 2. 208.)

Mr. Barrington, who is so well known to the profes- sion as a legal antiquarian, admits (Observations on the Statutes, 68.) that the rule of refusing evidence of the truth of a libel was adopted by the more modern deter- minations of the common law courts, from the Star Cham- ber decisions. And if we recur back to the more an- cient English statutes and records, which are the highest evidence of the common law, we shall find that the fal- sity of the charge was always made a material ingredient in the libel. The statute of Westm. 1. Edw. I. c. 34. recites, that there had been oftentimes found in the country, devisors of tales, whereby occasion of discord had many times arisen between the king and his people, or great men of the realm ; and it enacts, that none there- after be so hardy as to publish any false news or tales, whereby such discord may grow, and he that doth so.

*1804.*

*The People*
*v.*
*Croswell.*

shall be imprisoned until he produce his author. The same description of the offence is contained in the statutes of 2 Rich. II. c. 5. 12 Rich. II. c. 11. and 1 and 2 Ph. & M. c. 3. and the last of them enacts, that if any person be convicted of speaking maliciously, of his own imagination, any false, seditious, and slanderous news or tales of the king or queen, he shall be set in the pillory, &c. We find solitary instances, in the reigns of Mary and Elizabeth, of prosecutions at common law, (Dyer, 155. Jenk. 5. c. 55. S. C. 1 Leon. 287.) under these statutes; but the Star Chamber, about that time, from its more summary proceedings and violent maxims, began to monopolize the whole jurisdiction of slander and libel.

Sir E. Coke, in his commentary on the statute of Westm. 1. ( 2 Inst. 226.) uniformly describes the offence, by the epithets false and feigned; and he says, that no punishment was inflicted, by this statute, upon the devisor or inventor himself of such false scandal, but he was left to the common law to be punished according to the offence which was aggravated, inasmnch as it was prohibited by statute. This passage shows conclusively, that in the opinion of Coke, this statute was in affirmance of the common law, and this was the opinion of *Atkins*, J. in the case of Townsend v. Hughes. (2 Mod. 1551, 152.) This statute is, therefore, a very sure index of the meaning of defamation at common law; and as a further evidence on the subject, I refer to Fleta, (lib. 2. c. 1. s. 10.) which was written under Edw. I. and was a treatise upon the whole law, as it then stood. It is there stated, that there are certain atrocious injuries, which are punished by imprisonment, such as the inventors of evil rumours, (*sicut de inventoribus malorum rumorum*,) by whom the public peace is destroyed.

The form of the record of a conviction of one John Northampton, in the K. B. for a libellous letter upon the court, is given by Coke, in his 3d Institute. (p. 174.) The defendant confessed the libel, and was imprisoned and bound to his good behaviour, and the record stated that the libel was false : *qua litera continet in se nullam veritatem.* The records of the courts have always been esteemed as the most authentic memorials of the law ; and it is an important fact, which may now be noticed, that the indictments for libels have always charged the libel to be false, as well as malicious ; and it was not until very lately, that this epithet has been omitted. (7 Term. Rep. 4.) I am aware that it has been said, (9 St. Tr. 302.) that the falsehood of the libel was not the ground of the judgment in the case of Northampton ; but I see no reason for that assertion, for the words could have no other use or meaning upon the record ; and it is absurd to suppose they were inserted by the judges, in order to acquit themselves to the king.

It appears clear, from this historical survey, that the doctrine now under review, originated in the court of Star Chamber, and was introduced and settled there about the beginning of the reign of James I. (Breverton's case, 2 Jac. I. and the case in 5 Co. 125. 3 Jac. I. both settled the rule.) It was no doubt considered at the time, as an oppressive innovation ; but opposition must have been feeble to a court whose action and whose terrors were then at the greatest height ; and which exercised its superlative powers (as Hudson terms them) with enormous severity. The principle was, however, received in after times, with jealousy and scrutiny, as coming without the sanction of legitimate authority ; and it was not to be expected that a people, attached to the

NEW-YORK, 1804.

The People
v.
Croswell.

mild genius of the common law, of which trial by jury, in criminal cases, is one of its most distinguished blessings, would willingly receive the law and limits of the press from the decrees of so odious and tyrannical a jurisdiction.

After the abolition of the Star Chamber, under Charles I. we hear very little of the doctrine of libels, till we have followed the judicial precedents down to the era of the revolution. During the reign of the Stuarts, the press was stifled by the imprimaturs of government, which were first introduced by the acts of uniformity, and borrowed from the inquisition. (1 Bl. Rep. 114, 115. 4 Bl. Comm. 152. note.) After the Star Chamber had ceased, the parliament subjected all publications to the arbitrary control of a license. Whoever has the curiosity to examine the licensing act of 13 and 14 Car. II. c. 33. will at once perceive that there was no longer any need, either of the jurisdiction or doctrines of the Star Chamber, to control seditious and libellous publications. The case of the Seven Bishops (4 St. Tr.) is the first instance in which the new doctrine of libel was brought into the court of K. B. and submitted to the test of a jury : and here we consult once more the genuine oracles of the common law ; and although their responses may not be altogether consistent or unequivocal, we listen to them with delight and instruction. On this trial, the attorney-general contended that it was not to be made a question, whether the libel was true or false ; and he grounded himself entirely upon the decisions in the Star Chamber, as he cited no other. But the counsel for the defendants, under the permission of the court, went at large into argument and proof, to show the dispensing power of the crown illegal, and that the allegation in

the petition was true. And when the judges came to charge the jury, which they did separately, two of them were of opinion that the petition was a libel, and that whether true or false, was immaterial. The third judge placed the question altogether upon the *quo animo* of the defendants, but the fourth judge (Mr. Justice *Powell*) told the jury, that to make a libel, it must be false, it must be malicious, and it must tend to sedition ; and that if there was no dispensing power in the king, which he believed, then it was no libel to say that the krng's declaration was illegal. The jury were of his opinion, and acquitted the defendants.

The next case that meets our attention, is that of Fuller, (5 St. Tr. 442. 444. 8 St. Tr. 78.) who was tried before Lord Ch. J. *Holt*, on an information for a libel upon the government ; and when the defendant came to his defence, being without counsel, the *Chief Justice* asked him, in these words : " Can you make it appear that these books are true ? If you take it on you to write such things as you are charged with, it lies upon you to prove them, at your peril. These persons are scandalized, if you produce no proof of what you charge them with. If you can offer any matter to prove what you have written, let us hear it. . If you have any witnesses, produce them." Nothing can be plainer or more decisive than this language of the Ch. J. To do away the force of this case, it has been urged, (9 St. Tr. 303.) that Fuller was prosecuted as a cheat and impostor. But the information says no such thing. The charge is expressly laid to consist in publishing two false, scandalous, and defamatory libels. The judge calls them libels, and charges the jury to convict him of publishing the scan-

dalous books. It has also been said (M'Nally on Evid.
vol. 2. p. 649.) that this information was upon the sta-
tute of Scand. Mag. but no statute is mentioned, nor does
it conclude against the form of the statute ; and it must,
therefore, be taken as a prosecution at common law.

After this we meet only with two dicta, the one of
Holt himself, and the other of Ch. J. Pratt, (11 Mod. 99.
Str. 498.) declaring generally, that the truth was no jus-
tification on an indictment for a libel, until we come to
Franklin's case, in 1731. (9 St. Tr. 269.) There the
defendant's counsel (Mr. Bootle and Sir J. Strange) of-
fered evidence to prove the libel true, but Lord Ch. J.
Raymond overruled the evidence, and observed, that it
was not material whether the facts charged in the libel
were true or false. " Then I submit," replies Mr.
Bootle, " whether this will not tend to the utter suppres-
sion of the liberty of the press, which has been so bene-
ficial to the nation. As the Star Chamber is now abo-
lished, I dont know how far that doctrine may be adhered
to. I should be glad to have one instance or authority
of this, where a publisher of news is not allowed to say
this piece of news is true. Is there no distinction to be
made between false news and true news, and cannot we
now animadvert or take notice of public affairs as well
as formerly ?" The attorney-general, although thus pres-
sed for his authorities, produced no case to the point, but
the case de libellis famosis, in 5 Coke ; and he laid down
a doctrine totally incompatible with any freedom of the
press, which was, that a printer may lawfully print what
belongs to his own trade, but he is not to publish any
thing reflecting on the character and reputation and
administration of his majesty or his ministers.

It is a little remarkable, that the prohibition to the

jury to judge of the criminality of the libel, and the pro-
hibition to the defendant to give the truth in evidence,
received together their first authoritative sanction in a
court of common law, by this *nisi prius* decision of Lord
*Raymond.* It seems, however, to have been acquiesced
in, and to have been, from that time, generally taken as
the law, without further inquiry or examination. And
yet, upon the trial of John Horne, (11 St. Tr. 283.) before
Lord *Mansfield,* upon an information for a libel, in
charging the king's troops with murdering the Americans,
at Lexington, the defendant was permitted to call wit-
nesses to prove the truth of the libel; and the attorney-
general, (*Thurlow,*) in his reply, observed, that the de-
fendant was to prove the charge, and that it was the first
hour that it ever entered his imagination, that that spe-
cies of proof could be allowed. Lord *Mansfield,* in
charging the jury, observed, that if it was a criminal
arraignment of the king's troops, they would find their
verdict one way; but that if they were of opinion that
the contest was to reduce innocent subjects to slavery,
and that they were all murdered, why then they might
form a different conclusion, with regard to the meaning
and application of the paper.

This case, and the others I have mentioned, show that
the admission of the truth in evidence, and that the jury
are to judge of the intent, have been considered as very
much connected together, and have shared the same fate.
In this case of Horne, Lord *Mansfield* placed the ques-
tion undoubtedly on its true ground, which is, that if the
libel be false, the jury are to conclude one way, but if
true, they may then form a different conclusion as to the
meaning and application of the libel.

In addition to this case, there are decisive proofs that

NEW-YORK,
1804.

The People
v.
Croswell.

the opinions even of the highest professional characters were unsettled and at variance, so late as the year 1792, on this interesting and litigious question. It was one of the questions proposed, in that year, by the house of lords to the judges ; and Lord *Kenyon*, (Senator, vol. 5. p. 684.) after vindicating the practice of the courts as to the control of the jury, said, that the only doubt in practice was, whether the truth should be taken as part of the defence, and that he thought a clause to determine that point would be necessary to the bill. Lord *Camden* (Senator, vol. 3. p. 646.) went farther, and made a vigorous and eloquent defence of the freedom of the press. " A paper," he observed, " that tended to excite sedition, was libellous ; but a paper that reflected upon the conduct of ministry, that pointed out their base and mischievous proceedings, that went to open the eyes of the world, ought not to be considered as libellous. The jury must judge of the seditious tendency of the libel. Some would have every censure on the measures of government a libel. If this were the case, the voice of truth would cease to be heard amidst the notes of adulation. It ought to be left to a jury to decide, whether what was called calumny, was well or ill founded."

I have thus shown, that the rule denying permission to give the truth in evidence, was not an original rule of the common law. The ancient statutes and precedents, which are the only memorials to which we can resort, all place the crime on its falsity. The court of Star Chamber originated the doctrine, and it was considered an innovation. When it was brought into a court of common law, it was resisted and denied ; the court dared not practice upon it, and the jury gave it their negative. Lord *Holt* totally disregarded the rule,

in the case of Fuller; and it did not become an express decision of a court of common law till Franklin's case, in 1731; and there the counsel made a zealous struggle against it, as new, dangerous, and arbitrary. In the trial of Horne, Lord *Mansfield* laid the rule aside, and the counsel for the crown rejoiced at an opportunity to meet the defendant upon the merits of the accusation. In 1792, it was made a questionable point, in the house of lords, and one of the highest law characters in the house seems to have borne his testimony against it. I feel myself, therefore, at full liberty to examine this question upon principle, and to lay the doctrine aside, if it shall appear unjust in itself, or incompatible with public liberty, and the rights of the press.

But, whatever may be our opinion on the English law, there is another and a very important view of the subject to be taken, and that is with respect to the true standard of the freedom of the American press. In England, they have never taken notice of the press in any parliamentary recognition of the principles of the government, or of the rights of the subject, whereas the people of this country have always classed the freedom of the press among their fundamental rights. This I can easily illustrate by a few examples.

The first American congress, in 1774, in one of their public addresses, (Journals, vol. 1. p. 57.) enumerated five invaluable rights, without which a people cannot be free and happy, and under the protecting and encouraging influence of which these colonies had hitherto so amazingly flourished and increased. One of these rights was the freedom of the press, and the importance of this right consisted, as they observed, " besides the advancement of truth, science, morality, and arts in ge-

NEW-YORK,
1804.

The People
v.
Croswell.

neral, in its diffusion of liberal sentiments on the administration of government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated into more honourable and just modes of conducting affairs." The next high authority I shall mention, is the Convention of the people of this state, which met in 1788. They declared, unanimously, (Journals, p. 44. 51, 52. 73, 74.) that the freedom of the press was a right which could not be abridged or violated. The same opinion is contained in the amendment to the constitution of the United States, and to which this state was a party. It is also made an article in most of the state constitutions, that the liberty of the press was essential to the security of freedom, and ought to be inviolably preserved; and in two of those constitutions, (Pennsylvania and Ohio,) this freedom of the press is specifically defined, by saying, that in prosecutions for any publications, respecting the official conduct of men in a public capacity, or where the matter is proper for public information, the truth may always be given in evidence. I shall mention, lastly, the act of congress, of the 14th July, 1798, which prescribed penalties for certain specified libels upon the government of the United States, and allowed the truth to be given in evidence, on every prosecution under that act; and it is worthy of notice that the part of the act allowing the truth to be given in evidence, was declaratory, and thereby conveyed the sense of congress that such was the already existing law.

These multiplied acts and declarations are the highest, the most solemn, and commanding authorities, that the state or the nation can produce. They are generally

the acts of the people themselves, when they came forward in their original character, to change the constitution of the country, and to assert their indubitable rights. And it seems impossible that they could have spoken with so much explicitness and energy, if they had intended nothing more than that restricted and slavish press, which may not publish any thing, true or false, that reflects on the character and administration of public men. Such is the English doctrine of the liberty of the press, as asserted in Franklin's case. (See also Hawk. tit. Libels, 7.) A treatise on hereditary right has been held a libel, although it contained no reflections upon any part of the subsisting government. (Queen v. Bedford, Str. 189. Gilbert's Rep. K. B. 297.) And if the theory of the prevailing doctrine in England, (for even, there it is now scarcely any thing more than. theory,) had been strictly put in practice with us, where would have been all those enlightened and manly discussions which prepared and matured the great events of our revolution, or which, in a more recent period, pointed out the weakness and folly of the confederation, and roused the nation to throw it aside, and to erect a better government upon its ruins? They were, no doubt, libels upon the existing establishments, because they tended to defame them, and to expose them to the contempt and hatred of the people. They were, however, libels founded in truth, and dictated by worthy motives.

I am far from intending that these authorities mean, by the freedom of the press, a press wholly beyond the reach of the law, for this would be emphatically Pandora's box, the source of every evil. And yet the house of delegates in Virginia, by their resolution of the 7th

January, 1800, and which appears to have been intended for the b enefit and instruction of the union, came forward as the advocates of a press totally unshackled, and declare, in so many words, that " the baneful tendency of the sedition act was but little diminished by the privilege of giving in evidence the truth of the matter contained in political writings." They seem also to consider it as the exercise of a pernicious influence, and as striking at the root of free discussion, to punish, even for a false and malicious writing, published with intent to defame those who administer the government. If this doctrine was to prevail, the press would become a pest, and destroy the public morals. Against such a commentary upon the freedom of the American press, I beg leave to enter my protest. The founders of our governments were too wise and too just, ever to have intended, by the freedom of the press, a right to circulate falsehood as well as truth, or that the press should be the lawful vehicle of malicious defamation, or an engine for evil and designing men, to cherish, for mischievous purposes, sedition, irreligion, and impurity. Such an abuse of the press would be incompatible with the existence and good order of civil society. The true rule of law is, that the intent and tendency of the publication is, in every instance, to be the substantial inquiry on the trial, and that the truth is admissible in evidence, to explain that intent, and not in every instance to j 'tify it. I adopt, in this case, as perfectly correct, the cor 'ehensive and accurate definition of one of the couns the bar,* that the liberty of the press consists in i right to publish, with impunity, truth, with good mc

* General Hamilton.

tives, and for justifiable ends, whether it respects go-vernment, magistracy, or individuals.

I conclude, therefore, that a new trial ought to be awarded, for the misdirection of the judge, and that the defendant was entitled to give in evidence, upon the trial, the truth of the libel.

THOMPSON, J. concurred.

LEWIS, Ch. J. This cause has assumed an air of importance which I should be disposed to ascribe, in a great measure, to the spirit of the times, rather than to its intrinsic merits, did not the characters of the counsel who appear in support of the motion now under con-sideration, preclude the idea.

A printer, charged with a libellous and malicious pub-lication, has called forth, in his defence, the gratuitous exertion of the choicest talents that grace this bar. This circumstance would impose a belief, that questions of high importance are involved, and, under this impres-sion, I have given them a careful examination.

As the trial of the issue has been the subject of much newspaper animadversion and misrepresentation, and as the decision on this motion will probably share the same fate, I think it a duty I owe myself, to state, that the questions raised do not come before us on the report of the judge before whom the cause was tried, which is the usual and ordinary mode in criminal cases, but on a statement of facts, as agreed on between the parties, as in civil prosecutions. Where they differed, recurrence was had to my minutes; but where they agreed, I was not consulted. The consequence is, that my charge has not been correctly stated. I am made to say, among other things, " that, particularly in trials for libels, the jury were not judges of the law and the fact; and that

in cases of libels only, could the court set aside a general verdict of guilty, if the indictment set forth nothing in their judgment libellous." My language was, that the rule of law which confined jurors to the consideration of facts alone, was strictly applicable to the case of libels, where the question of libel or no libel was an inference of law from the fact ; and that it was, perhaps, the only case in which courts had invariably regarded a general, as a special verdict, and where they would, *ex mero motu*, arrest the judgment, if the law was with the defendant. (*a*)

I shall now consider the various points that have been submitted. The first is, " That the trial ought to have been put off, in order to give an opportunity to the defendant to prove the testimony stated in the affidavit." The only ground on which this testimony was then argued, as important to the defendant, was, that if the truth of the facts charged as libellious should be made to appear, it would amount to a complete justification. Believing, as I then did, and still do, that the testimony was inadmissible, I denied the motion.

My subsequent examination of this point has so confirmed me in the opinion which I then entertained, that I now pronounce, with confidence, that it ever has been invariably, and still is, the law of England, that the truth cannot be given in evidence, as a justification in a criminal prosecution for a libel, at common law. Nay, I might almost venture to say, there is not a single *dictum* in the books to the contrary.

The cases establishing this doctrine are :

1. The case *de Libellis Famosis*, in which it is re-

(*a*) The statement of the case has been altered from the one read at the argument, so as to agree with this explanation.

solved, that it is not material whether the libel be true, or whether the party against whom it is made, be of good or ill fame; for that in a settled state of government, a party grieved ought to complain for an injury to the settled course of law.

To this authority various objections have been raised.

First, that it was a *Star Chamber* decision. This is true, but it must be remembered, that at this period, that tribunal was incorrupt, and its decisions as correct and as much respected as those of any other court within the realm. *The arbitrary House of Tudor no longer held the sceptre.*

Again; it is objected, on the authority of Mr. Barrington, that the resolutions in the case *de Libellis Famosis* are extrajudicial. This is also true. But it must not escape our notice, that the very proof he adduces, in support of the assertion, is a decisive authority in favour of the doctrine I contend for. His words are : " As the libeller is stated to have confessed both the *writing* and *publication*, the *only* question before the court must have been, what fine or punishment they should inflict."

Mr. Barrington's objection, however, is not pointed to this particular resolution, and if it was, it would not diminish the authority; for many of Lord Coke's reports contain resolutions irrelevant to the point immediately under consideration, which have, nevertheless, been received as high authority.

The next case in order of time, and which has been cited as authority by both parties, is that of Lake v. Hatton. By the defendant, it is adduced to show that Sir Edward Coke had changed his opinion on the point under consideration. No such inference can be drawn

from it.   It would,  perhaps, be a, sufficient. answer to say, that it is hardly presumable that such a character, after so solemn an opinion as that delivered in the case *de Libellis Famosis*, should, in the short period of eleven years, have · suddenly overturned that decision, without assigning a  single reason for the change.   A desire to detract from the  merits of that great man, frequently appears in the reports of Lord Hobart; in none more strikingly than in this, in which he charges him, very indelicately, with *a great deal of  violence.*   The manner too of introducing the· remark  attaches to it suspicion. The point on which sir Edward differs from the court, is, as to the propriety of retaining the suit ; the Countess of Exeter, the party injured by the libel, not being a party to the complaint.   Hobart, alluding to this point, at the close of the  report  observes, " *and  where Sir  Edward Coke had said,*" &c. clearly showing the observation, if made at all, to  have  been a mere incidental one, that point not  having  been under  consideration.   But admitting Sir  Edward Coke did make  the observation, it was a correct one, as applied to  that particular case. On looking into the powers exercised by the *Star Chamber*, it will appear, that after the new modelling of that court, by the 3d of Hen. VII. it became a court for determining questions of civil  right founded on, *tort,* as well as criminal prosecutions.   Civil suits, particularly in cases of libel, were frequently carried on there ; and the court claimed cognizance of them, by virtue of the general terms of the statute, *unlawful writings*.   Criminal proceedings were instituted, pursuant to the statute, by information, civil suits by bill to the chancellor.   The case of Lake v. Hatton was of the latter description ; it

was commenced by bill, and carried on between private individuals. Sir Edward Coke was then correct in saying, that " the Countess of Exeter ought to have been a party to the suit, for had she a purpose to poison, Hatton might then have justified the libel ;" and if he was overruled by the rest of the court, it is a stronger case than any in the books against the doctrine of truth being a justification.

In Want's Case, (Moore, 627.) in the reign of Car. II. the question came fairly up, and the whole court were of opinion that the libel was punishable, though the matter was true. This was also a *Star Chamber* case.

I come now to the consideration of cases, to which that objection does not lie. In The King v. Saunders, in B. R. in the same reign, the information was for writing a scandalous libel to Hugh Rich, who was indebted to him, and had kept him out of his money for three years, by obtaining a protection. The libellous letter charged him with dishonesty, want of humanity, and cheating, in thus using him. The defendant was found guilty, and it was moved in arrest of judgment, that the substance of the letter being true, was not scandalous. But the Court said, the letter is provocative, and tends to the incensing Mr. Rich to a breach of the peace. He was fined 40 marks ; the four justices, Keelyng, Twisden, Rainsford and Moreton concurring.

In Franklin's Case, tried before Lord Ch. J. Raymond, in 1731, on an information for a libel, in publishing a letter from the Hague, stating a report, that the administration contemplated a treaty with the Emperor, in violation of the treaty of Seville ; Mr. Bootle and Mr. Strange, of counsel for the prisoner, offered to show the

letter a genuine one, and the truth of the facts it con-tained. The testimony was refused, the Lord Chief Justice observing, " that it is not material, whether the facts charged in a libel be true or false, if the prosecution is by indictment or information.

The last English case I shall cite, though there are many others to the same effect, is a very modern one. It is that of The King v. Burks, (7 Term Rep. 4.) in which Lord Kenyon declares, that the term *false* is not necessary in an information, because the falsehood is not necessary to be proved. This decision being subsequent to the British statute of 1793, shows that the law, in this particular, is not there considered as affected by that statute.

On the trial of John Peter Zenger, in this state, under its colonial government, the same rule of law was laid down by Chief Justice Delancey. To this decision is objected the high state of party at the time. This is an objection which would apply with more force to the case of the Seven Bishops, and yet an expression of a single judge, in that case, has been relied on as authority by the defendant's counsel. Chief Justice Delancey, I have ever understood, was esteemed an able lawyer, and as his opinion was sanctioned by those of many able men who went before him, I am disposed to pay it as much respect as if it had been delivered in Westminster Hall.

The cases relied on by the defendant's counsel come now to be considered. The first, and one of the earliest in the books, is that of John De Northampton, in which the court, in rendering judgment, made use of these words, *quæ litera continet nullam veritatem.* Hence it is inferred, that the falsity of the libellous matter must have appeared in evidence. By recurring to the case, it will

appear that the truth or falsity of the libel, from the very nature of it, could not have come in question. The defendant, an attorney of the king's bench, wrote a letter to a member of the council, stating that neither the chief justice, nor his fellows, the king's justices, any great thing *would do*, by commandment of the king. Now, whether they would or not, was a fact susceptible of proof, by subsequent events alone. The expression, therefore, in the judgment rendered, must be considered as a declaration of the judges, introduced to prevent that indignation of the king towards them, which they say the libel was calculated to produce.

Old Noll's Case, and the anonymous case from 1 Lev. 287. were both on the statue of *Scandalum Magnatum,* and, therefore, inapplicable to the present question.

Curl's Case was cited, but with what view I cannot comprehend; for I can find no point in it, but whether publishing an obscene book was punishable in a temporal court.

Much reliance has been placed on the *dictum* of Powel, in the case of the Seven Bishops. He is made to say, " to make it a libel it must be false," &c. If he did say so, he certainly was guilty of an inaccuracy of expression, because he clearly had no allusion to a fact to be given in evidence to a jury, but to a question of law. The Bishops were charged with presenting a libellous petition to his majesty, (which was couched in terms of the profoundest reverence and respect,) assigning their reasons why they could not comply with his majesty's command, to cause his declaration of toleration to be read in the churches of their dioceses. The reason assigned is, they apprehend the declaration to be illegal, because it is founded on a dispensing power.

Powel insists, that to render this libellous, the king must have such dispensing power, which is a question of law. He denies that he has such dispensing power, and, therefore, concludes that the petition is not libellous.

Fuller's Case, also, has been much relied on. This, however, was not a prosecution for a libel simply; but as a cheat and impostor, in attempting by a libellous and false publication, to obtain money fraudulently and deceitfully from King William. He charged, in two publications, entitled, " *Original Letters of the late King's and others*," &c. certain ministers of the king with carrying on a criminal correspondence with the deposed monarch, James II. when in France, and distributing French money in England; setting forth, in such publications, two affidavits, one of Thomas Jones, the other of Thomas Widdrington, tending to substantiate the facts. On the trial, Holt, Chief Justice, observes to him, " You charge many persons with corresponding with France, and cannot prove it." Then speaking of Jones and others, who were implicated, he observes, " these persons are scandalized; for you produce no proof of what you charge them with; and you say, I had the original of this from Mr. Jones, &c. where are they ?" These questions were *undoubtedly proper*, considering that the fraud, and not the libel, was the *gist* of the prosecution. It is stated expressly, as a prosecution against him as a cheat and impostor; and as an evidence that it was really so intended, the information, if examined, will be found to contain not a single *innuendo*.

Tuckin's Case appears to have been forcibly pressed into the service. Indeed, after reading it carefully through, it was with difficulty I could discover any thing in it that even glanced at the question. Mr. Montagu,

in addressing the jury, on behalf of the defendant, makes some observation on that part of the libel, which consists in a charge of mismanagement of the navy. Upon which Sergeant Darnel asks, " Will you say they are true ?" Really, I know not what is to be inferred from this question. One counsel asking another if he means to assert a thing to be true, is but a weak authority to show that truth will justify a libel.

Great stress has been laid on the case of The King v. Horne, in which Lord Mansfield is said to have departed from the rule, and permitted the truth to be given in evidence. This is not the fact. The circumstance relied on is, his admitting the testimony of Mr. Gould, a subaltern officer employed with the British troops at Lexington and Concord, respecting the transactions that took place in the course of that expedition. But it was admitted, neither for the purpose of justifying the defendant, nor to show the intent of the libellous publication. It was simply to ascertain whether the facts would support the charge in the information. The charge was for a libel *concerning his majesty's government, and the employment of his troops*, by asserting that those troops had, at the places above mentioned, inhumanly murdered the *Americans*, for preferring death to slavery. The defendant alleged that soldiers were as capable of committing murder as citizens, and that the facts he alluded to in the supposed libellous publication, might have taken place in an affray. Had this been really the case, it is evident a circumstance of this kind would not have supported an information for a libel *concerning his majesty's government, and the employment of his troops*. That this was the ground on which Mr. Gould's testimony was admitted, appears from Lord Mansfield's own declaration, when Mr. Horne was

NEW-YORK,
1804.

The People
v.
Croswell.

brought up for judgment.    He moved, in arrest of judg-
ment, that the information did not state that the troops
were employed in quelling an insurrection or rebellion.
Upon this his lordship observes, " If the defendant has
a legal advantage from a literal flaw, God forbid that he
should not have the benefit of it."    It is most certain,
that at the trial, the information was considered to be,
words spoke of and concerning the king's government,
and his employment of his troops ; that is, the employ-
ment of the troops by government.    Upon that ground,
the defendant called a witness, Mr. Gould.    The attor-
ney-general rose to object to him ; but it was very clear
that he was a proper witness ; and he acquiesced imme-
diately, because it was extremely material to show *what
the subject matter was to which the libel related.*  If it was
the  employment of the troops under proper authority,
that came within the charge in the information.    Had it
been a lawless affray, it would not.    Though the saying
so *might have been a libel on the individuals,* yet it would
not have been this libel.    It would not have been this
libel of the king's troops, employed by him.

The opinion of the twelve judges of England, delivered
to the house of lords in the year 1792, when the act for
the amendment of the law, in cases of libel, was under
consideration, is also conclusive on the point.

I believe I have noticed all the leading authorities on
this subject.  The result to my mind is, that they evince
a uniform course of decision, establishing the law as laid
down at the trial.

Whether the rule is correct in principle, has also been
made a question.   The popular sentiment, I know, is de-
cidedly opposed to it ; and I am free to confess, that
before I had fully considered the subject, the inclination

of my own mind was strong that way. But on reflection, I have discarded the opinion, satisfied that truth may be as dangerous to society as falsehood, when exhibited in a way calculated to disturb the public tranquillity, or to excite to a breach of the peace.

Aware of the consequences of a contrary doctrine, a distinction has been attempted between giving the truth in evidence, as a justification, and as forming an ingredient in ascertaining the intent. This is a distinction, for the discovery of which we are indebted to the ingenuity of our own times; there is certainly nothing to be met with in the books to rob us of the honour of it. It has, however, an indisputable title to respect, and will doubtless be regarded, whenever a case shall arise, in which the intent shall be a fit subject of inquiry for a jury, and the truth shall be capable of opening an avenue to the heart, through which it may be discovered. Under such circumstances, I should not hesitate to admit it ; but as I do not consider the present case entitled to the benefit of it, it cannot influence my opinion, as to what ought to be the issue of the present application.

This leads me to the consideration of the question next in importance, which is, whether the intention of the defendant, in publishing the libel with which he is charged, ought to have been submitted to the inquiry of the jury, as a fact on which his guilt or innocence depended. The intent is certainly an ingredient in the constitution of every offence. But it is as certainly, in many cases, though not in all, an inference of law deduced from facts. Where an act, in itself criminal, is performed without lawful excuse, there the criminal intent is an inference of law. But where an act, in itself indifferent or innocent, is performed, there, to constitute it a crime, a criminal

intent is an essential ingredient, and a proper subject for the inquiry of a jury. This distinction is not peculiar to the case of libel. In a private prosecution for slandering a man in his profession, trade, or calling, the malicious intent is of the essence of the action; and yet, courts invariably inform a jury, that if they find the fact, the law infers the malicious intent, and that the plaintiff is entitled to their verdict. So, too, in some cases of murder: as where a workman, in a populous city, where persons are continually passing, carelessly throws a piece of timber from a scaffold and kills a passenger, the malicious intent is an inference of law from the fact.

An objection, not without force I admit, is here to be encountered. In the case above alluded to, as well as in some others, judges uniformly state the law to the jury, and leave them to decide on the law and fact collectively. How this has obtained I can only conjecture. I am inclined to ascribe it to the humanity of judges, inducing them to afford (in cases where the prevailing manners of the times, or other circumstances, form a reasonable, though not a legal excuse) a chance of acquittal to a party accused, which an adherence to strict rules of law would deny him. These cases only form exceptions; they do not impugn the rule, that to questions of law the court, to questions of fact the jury, must respond.

It has been attempted to narrow this rule, by restricting the exclusive right of judges on all general issues, to the case of special verdicts. It is true, in Bushel's Case, decided in 22 Car. II. Vaughan declares such to be the law. But I do not find that judges, since his day, have followed his opinion. On the contrary, I think it has been uniformly rejected ever since the period of the revolution in 1688. Certainly, his reasoning in that case

would not be received as law at this day. He admits the right of the judge, when the jury find, unexpectedly, for the plaintiff or defendant, to ask them how they find such a fact in particular; and upon their answer, to say, then it is for the defendant, though they found for the plaintiff, and è *contrario*, and thereupon they rectify their verdict.

He also assigns, as a reason, why a jury is not finable for a false verdict, that the judge cannot know their evidence, for their verdict may be the result of their own knowledge of the fact, or such knowledge derived from each other. Surely, at this day, such doctrine is inadmissible, and destroys the authority of this case.

Judge Blackstone has been cited, as an authority to the same point; but, in my opinion, he emphatically establishes the reverse. " The verdict," says he, " may be general or special; setting forth all the circumstances, and praying the judgment of the court. This is where the jury doubt the matter of law, and, therefore, choose to leave it to the determination of the court; though they have an unquestionable right of determining upon all the circumstances, and finding a general verdict, if they think proper so to hazard *a breach of their oaths :* and; if their verdict be notoriously wrong, they may be punished, and the verdict set aside by *attaint*, at the suit of the king; but not at the suit of the prisoner." What! Men to be punished for a breach of their oaths, in exercising a right? This would be preposterous. The right here spoken of is nothing more than the right of insisting upon their verdict being received and recorded, though it be general, where it ought not to be so. But is this a species of right, which shall impose it upon a judge, to inform them that they may exercise it, though they violate their oaths? Surely not.

It cannot be denied, however, that there has existed a difference of sentiment among great law characters on this subject.    The argument of Mr. Erskine, on a motion for a new trial, in the case of the Dean of St. Asaph, in favour of the right of a jury to judge of the intent in all cases, is ingenious and able.    The opinions of Lords Camden and Loughborough, in the house of lords, when the libel bill was under consideration, are entitled to respect.    But sitting as a court of justice, we are not to receive the law either from the arguments of counsel, or the opinions of individuals given in a legislative capacity; particularly, if opposed to solemn judicial decisions.    For the one will always urge what is most favourable to his client; the others will frequently advance as legislators what they would not support as judges.    Of this, instances are not wanting, even under our own government.    Judicial decisions on the point are, in my opinion, the other way.

In Fuller's case, (5 St. Tr. 445 an. 1702,) Lord Holt, in a very concise address to the jury, observes, " You hear the witness say, *he* (meaning Fuller,) brought these two scandalous books to the press, and that *he* corrected them ; and he owns that he was the publisher of them ; and if you believe he did so, you are to find him guilty." Not one syllable is said to them about inquiring into any criminal intent.

In the case of Tuchin, two years after, (1704,) this same learned judge is said to have spoken a different language.    I do not so understand him.    The defendant's counsel had insisted that nothing was a libel but what reflected upon some particular person.    To remove any improper impression, which such an assertion might make on the jury, his lordship observes, that a libel on

the government is criminal. That no government could subsist, if persons were not called to account, for possessing the people with an ill opinion of the government; and he submits it to the consideration of the jury, whether the words he had read to them did not tend to beget an ill opinion of the administration of the government. Here, also, nothing is said of intention. He submits to the consideration of the jury, the unavoidable tendency of such libellous publications, merely to rebut the argument of counsel, but says nothing about intention; on the contrary, he concludes, by telling them " if you are satisfied that he is guilty of composing and publishing these papers, you are to find him guilty."

We find Lord Raymond, in Franklin's Case, (9 St. Tr. 255.) laying down the same rule of law. " There are three things," said his lordship, "to be considered, whereof two by you the jury, and one by the court. The first is, whether the defendant is guilty of the publication or not. The second, whether the expressions in the letter refer to his present majesty, and his principal officers and ministers of state, and are applicable to them or not. These are the two matters of fact that come under your consideration; and of which you are the proper judges. The third does not belong to the office of the jury, but to the office of the court. This is a question of law," &c.

In The King v. Owen, Lord Chief Justice Lee directed the jury, that if they thought the fact of *publication* fully proved, they ought to find the defendant guilty. (10 St. Tr. App. 194. anno 1752.)

The same rule has been uniformly and invariably adopted, and observed by all the judges of the king's bench, until the statute of 1793, which authorizes the jury to decide on the whole matter in issue. That

NEW-YORK,
1804.

The People
v.
Croswell.

statute, it ought not to be forgotten, was passed at the commencement of an unpopular war with France, and was principally advocated by a party hostile to the then administration.

In the case of The King v. Wilkes, for publishing the *North Briton*, No. 45. the jury found a verdict of *guilty of printing and publishing the North Briton*, No. 45. which was recorded generally, *guilty*. And although the national ferment, at that day, was immoderately high, and Mr. Wilkes regarded as a patriot of the highest order, no exception was ever taken. (4 Burr. 2527. from 1764 to 1770.)

In the case of The King v. Woodfall, (5 Burr. 2661.) for printing and publishing Junius, the jury found the defendant guilty of printing and publishing *only*. On a supposition, that this word *only* was introduced by the jury, to negative some part of the information, a new trial was applied for. On which occasion, the court observes, that the verdict found the whole charge in the information, and that if the jury meant to say " they did not find it a libel," or " did not find the epithets," or " did not find any express malicious intent," it would not affect the verdict; because none of these things were to be proved, or found either way. " That guilty of printing and publishing, where there is no other charge, is *guilty :* for nothing more is to be found by the jury." And Lord Mansfield observes, that such direction, though often given with an express request from him, " that if there was the least doubt, the court might be moved upon it," was never complained of in court.

In the case of The Dean of St. Asaph, (1784,) which was, like the present, a trial at *nisi prius*, the same rule was laid down by Judge Buller on the trial, and after-

wards, on a motion to set aside the verdict, for misdirection, affirmed by the whole bench of judges, after having had the full benefit of the brilliant and learned obscrvations of Mr. Erskine, on which so much reliance has been placed.

Lord Kenyon, who was never very partial to Lord Mansfield or Mr. Justice Buller, and who was esteemed a sound lawyer, has uniformly coincided with this opinion, and has regularly charged juries in correspondence with it.   In Stockdale's Case, (1789,) where he heard an argument from Mr. Erskine, similar to that which he delivered in the case of The Dean of St. Asaph, he instructs the jury, that there are two points for them to attend to, namely, whether the defendant did publish the libel ; and whether the sense which the attorney-general, by his *innuendoes* in the information, had affixed to the different passages, was fairly affixed to them.

The same direction was given by him at the trial of Withers, (3 Term Rep. 428.) on an indictment for writing and publishing a libel on Mrs. Fitzherbert, and no exception was taken.

The last authority I shall refer to is derived from the highest possible source.   It is the answers of the twelve judges of England, to the questions propounded to them by the house of lords, when the libel bill was under their consideration.   The first question is :

" Whether on the trial of an information or indictment for a libel, is the criminality or innocence of the paper set forth in such information or indictment, as the libel, matter of fact, or matter of law, where no evidence is given for the defendant ?"

Answer.   " Matter of law."

2. " Is the truth or falsehood of the written paper

NEW-YORK, 1804.

The People
v.
Croswell.

material to be left to the jury, upon the trial of an indictment or information for a libel ; and does it make any difference, in this respect, whether the epithet (false) be or be not used in the indictment or information ?"

Answer. " Not material."

3. " Is a witness, produced before a jury in a trial, as above, by the plaintiff, for the purpose of proving a criminal intention of the writer, or by the defendant to rebut the imputation, admissible to be heard, as a competent witness in such trial before the jury ?"

Answer. " A criminal intention is no part of the allegation, at common law, as no man shall be allowed to scatter arrows, firebrands and death, and then say, ' am I not in sport ?' "

Under this view of the subject, I am satisfied the law is as I stated it on the trial ; and that when it shall be determined to be otherwise, it will no longer be, what all law ever should be, a uniform rule of conduct.

It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government. But how, has not been attempted to be shown. In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct. It will be recollected, that I admitted there were cases in which the jury must necessarily inquire into the intent ; to wit, where the act did not carry intention on the face of it, and guilt or innocence depended on the circum-

stances of time, place, persons, &c. Such was the case of the Seven Bishops. They were charged, as has been before observed, with a libel, in presenting a petition to the king, conceived in terms of the most respectful loyalty. To petition the crown was the right of the subject, and as the petition carried not with it its own evidence of a guilty intent, or pernicious tendency, these were facts necessarily inquirable into by the jury. But is the case before us thus circumstanced? Will any one, uninfluenced by the strongest party prejudice, say, that a charge against the highest officer of our government, unpalliated by the shadow of lawful excuse, of employing a base assassin to stab the reputation of a man justly esteemed the pride and ornament of his country, does not carry with it conclusive evidence of a most malicious and seditious intention? I think it can admit of no doubt.

To the objection, that the judge ought to have declared the law to the jury, and submitted it to them, together with the fact, it is a sufficient answer, that the defendant thought proper to carry his cause before a tribunal constituted for the trial of issues of fact alone, where it is the invariable practice to reserve all doubtful points of law for a decision at bar. In the present instance, there was a peculiar propriety in adopting this course. For had a different one been pursued, and the defendant been acquitted, from the mistake of the judge in point of law, the error would have been irremediable, and the public justice defeated.

Had the examination I have given this subject, eventuated in a conviction that I had mistaken the law, I should, without hesitation, have renounced my error. The result being the reverse, and it being the duty of a

NEW-YORK,    judge to pronounce the law as he finds it, and to leave
  1804.        the alteration of it, when found inconvenient, to that
The People    body to whom the constitution has confided the power of
   v.          legislation, I am constrained to declare, I think the de-
Croswell.     fendant not entitled to a new trial on either of the grounds
              on which his motion is rested.

LIVINGSTON, J. concurred.